STATE OF VERMONT
SUPERIOR COURT – ENVIRONMENTAL DIVISION

|  | } |  |
|---|---|---|
| In re: Rivers Dev. Conditional Use Appeal | } | Docket No. 7-1-05 Vtec |
|  | } |  |

**************************************************************************

|  | } |  |
|---|---|---|
| In re: Rivers Dev. Act 250 Appeal | } | Docket No. 68-3-07 Vtec |
|  | } |  |

## Decision on Post-Judgment Motion to Alter

These two land use appeals were the subject of multi-day evidentiary hearings and a Merits Decision, issued on March 25, 2010. Appellant/Applicant Rivers Development, LLC ("Rivers") thereafter requested that this Court revisit its findings and legal conclusions, specifically as to Act 250 criteria 8, 9(e), and 10, as well as the corresponding provisions of the 2003 Zoning Regulations for the Town of Moretown, Vermont ("Zoning Regulations"). The Town of Moretown, its Planning Commission, and its School Board (hereinafter collectively referred to as "Town") and the Neighbors who participated in the merits hearings filed written objections to Rivers' post-judgment requests.

We have again revisited our factual findings and legal conclusions on the criteria challenged and, for the reasons detailed below, conclude that they have a sound factual and legal foundation. We offer some further explanation in this Decision, but have otherwise concluded that our findings and conclusions should otherwise remain unchanged. We therefore **DENY** Rivers' post-judgment amendment requests.

## I. Introduction

Rivers and the other parties have provided the Court with memoranda that thoroughly revisit the merits of this case and the voluminous materials presented by the parties and reviewed by the Court in its deliberations, research, and drafting of its March 25, 2010 Merits Decision ("Merits Decision"). Rivers' request to alter our findings and conclusions is only directed to three of the twenty Act 250 criteria and sub-criteria reviewed by the Court at trial, together with the corresponding Zoning Regulations provisions.[1] However, Rivers also focuses its

---

[1] The twenty Act 250 criteria and sub-criteria reviewed at trial are listed in the Merits Decision, at 4–5.

presentation of concerns on criteria where the Court determined that its proposed project conformed to the applicable Act 250 criteria and Zoning Regulations, specifically Act 250 criteria 5, 6, and 9(K). Rivers argues that the positive findings under these criteria compel positive findings and legal conclusions under criteria 8, 9(E), and 10. We do not address these arguments in detail here, because we find Rivers' general arguments in this regard unpersuasive. We have not been made aware of any Act 250 precedent or statutory authority requiring positive findings on Act 250 criteria where factual findings may overlap. Each of the ten Act 250 criteria (thirty in number when counting sub-criteria) have separate legal standards, requiring separate analysis of the criteria applicable to a project. See 10 V.S.A. § 6086(a) (identifying the Act 250 criteria). Simply because a project is found in conformance with criterion 6 (i.e., it does not place an unreasonable burden on the ability of a municipality to provide educational services) does not obligate a reviewing court to conclude that a project conforms with criterion 8 (i.e., it will not have an undue adverse effect on the aesthetics or the scenic or natural beauty of the area).

Rivers raises other points somewhat outside of its specific concerns regarding Act 250 criteria 8, 9(E), and 10. For example, Rivers expresses concern over what it perceives to be reliance by the Court on the designation of Route 100B as a Vermont Scenic Byway, pursuant to 19 V.S.A., Chapter 25. Rivers' concern is shared by the Vermont Agency of Transportation ("VTrans"), which chose not to appear or participate in these proceedings, but nonetheless felt compelled to file a letter with the Court after the Court had rendered its Merits Decision. See Letter from William H. Rice, Assistant Attorney General, to Judge Thomas Durkin, Vt. Envtl. Ct. Judge (June 3, 2010). Rivers' and Vtrans' concerns are principally based upon a state directive that a scenic byway designation is intended to "encourage economic development in byway communities" while protecting the "natural, cultural, and scenic resources" of an area, and is not "intended to be used in an Act 250 hearing, nor [to] . . . preclude any land development otherwise permitted by existing zoning" regulations. The Vermont Scenic Byways Program Manual, Vt. Agency of Transp. and Vt. Scenery Preservation Council, at 6, 9 (March 2, 2006).

Rivers' and Vtrans' concerns are misplaced in this regard. The scenic quality and uniqueness of Vermont Route 100B, as it travels from Middlesex, past the Rivers' property, and through Moretown Village, have been acknowledged since the early 1970s. Merits Decision at

42.  Most all of Route 100, as it travels from its beginnings along the Vermont/Massachusetts border, through our entire state, and to its end along the Vermont/Canadian border, encompasses some of our most scenic byways, whether they are acknowledged by federal, state, or local regulators, or not.  Id. at 9.  But the spur known as Vt. Route 100B is one of the most scenic and beautiful byways; the beauty and scenic quality of the areas along Route 100B predate, and are not dependent upon, its 2006 designation as a Vermont Scenic Byway.

We do not regret our reference to Route 100B's designation as a Vermont Scenic Byway; this fact was discussed extensively during trial.  But we take this opportunity to clarify our reference: the Scenic Byway designation played no role in the determinations announced in the Merits Decision.  The state regulatory designation is a mere acknowledgement of a preexisting fact:  Route 100B is one of the most scenic and beautiful byways in our beautiful state.  The regulatory designation played no role in our determinations on the land use applications that were the subject of these appeals.[2]

Lastly, we note that our Decision here does not address each and every one of the concerns Rivers expresses.  Were we to assume such an obligation, our decisions on post-judgment motions to alter could become as long, or longer than the original decision; we do not believe such post-judgment decisions should be crafted so as to subsume the original decision.  Rather, we have focused here on the material issues Rivers has raised; we have been cautious in this regard and exercised our best judgment in determining what is material in Rivers' critique.  That is not to say that our determinations, now or as announced on March 25, 2010, are perfect; we leave it to others to determine whether our assessment of the facts presented at trial was accurate or demands reversal.  We perceive no error so egregious.  We merely note that, given the volume and complexity of the evidence presented, we have made our best efforts to make accurate determinations, both here and in our prior Decision.

## II.      Criterion 8: impacts upon the aesthetics or the scenic or natural beauty of the area

As noted in the Merits Decision, an analysis under Act 250 criterion 8 is a subjective exercise, but one that has survived constant challenges and constitutional attacks.  Merits

---

[2]  This reality is reinforced by the fact that the regulatory designation of Route 100B as a Scenic Byway is only mentioned in one of the 223 Findings of Fact announced in our Merits Decision, first referenced on page 42 of the 71-page Decision.  This Finding also reinforces the immateriality of the state designation, since the Finding merely notes the location of the Rivers quarry in relation to the scenic corridor: the proposed quarry site is outside of the 300-foot wide scenic corridor area along the western side of Route 100B.

Decision at 49. The former Vermont Environmental Board first articulated a means for effective analysis under criterion 8 that this Court found analogous and cited frequently in its Merits Decision: Re: Brattleboro Chalet Motor Lodge, Inc., No. 4C0581-EB, Findings of Fact, Conclusions of Law and Order at 5 (Vt. Envtl. Bd. Oct. 17, 1984). We found this precedent relevant to our discussion in Rivers for two reasons. First, it brought an historical perspective to the Quechee analysis. Second, both projects had a common category of impacts: despite being different in nature and scope, both projects brought to a neighborhood commercial development never before experienced in their host areas. For these reasons, we continue to find our references to the Board's decision in Brattleboro Chalet relevant and important.

Rivers interprets the Court's legal conclusions here as holding the Rivers project to a standard much higher than all other previous regulatory reviews of other Vermont quarries. We disagree, and do so because Rivers' assessment is in error. The Court does not "require" Rivers to guarantee against fly rock. Rather, we noted moving testimony, including from Rivers' own expert, that he could not assure against fly rock occurring in such a manner as to cause damage or injury to the Rivers quarry neighbors. Rivers' expert continued his assessment of the project by recommending that neighbors seek shelter every time a blast is planned at the Rivers site, for the duration of its thirty-three-year life. But that testimony was not the only, or even the most compelling that finally convinced the Court to find against the Rivers project as to criterion 8; the most credible testimony was cumulative in nature, all evidencing the new and dramatically different uses, noises, and activities that the Rivers quarry would bring to this neighborhood.

The Court conducted a detailed review of the two step analysis, pursuant to the former Environmental Board precedent announced in Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order (Vt. Envtl. Bd. Nov. 4, 1985); see also In re Quechee Lakes Corp., 154 Vt. 543 (1990). We began our analysis, as we should, with citation to the specific statutory provisions in 10 V.S.A. § 6086(a)(8). As we often do, we preceded our detailed analysis with a summary of our conclusion that the project as proposed would "bring an undue adverse impact upon this area." Merits Decision at 53. Rivers claims that this phrasing was added inadvertently. Rivers' Motion to Alter at 15. But Rivers is mistaken; the Court hoped to provide clarity in its Decision by announcing its determination first, then providing the details of its reasoning. We regret any confusion our formatting may have caused.

The undersigned, both in his capacity as the District 2 Environmental Commission Chair for ten years (1995–2005) and as a presiding environmental judge for the past five and a half years, has presided over so many Act 250 applications for quarry projects as to have lost count. In composing our Merits Decision, we attempted to reference precedent from both the former Environmental Board and Vermont Supreme Court that we thought most helpful and relevant. The cases cited in the Merits Decision involved both quarry projects and other commercial or industrial projects. We did not restrict our research to only those cases concerning quarry projects; we expanded our research to those cases that provided the most articulate guide for criterion 8 analysis for projects, including quarries, that were new to a neighborhood. While we appreciate Rivers' compilation of all the quarry cases and other cases citing the Board's decision in Brattleboro Chalet, we do not see the need to expand upon our analysis under criterion 8 for this project.

## III.     Criterion 9(E): impacts from earth resources extractions

As noted in the Merits Decision, Act 250 criterion 9(E) requires an earth extraction project applicant to show that its proposed project will not cause an "unduly harmful impact upon the environment or surrounding land uses and development." 10 V.S.A. § 6086(a)(9)(E)(i). When assessing the Rivers project in this context, we noted the magnitude of new activities it would bring to the surrounding neighborhood. All these activities, including the "drilling, blasting, crushing, sorting, and transporting of rock within and from the quarry site," have not previously been experienced in this area. Merits Decision at 58–59.

Rivers takes great exception to its perception that the Court imposed a heightened burden upon its quarry application. Its perception in this regard is incorrect. The Court reviewed the characteristics of this quarry operation, including the blasting and crushing of rock, and the introduction of industrial-type activities, and compared them to the current attributes and characteristics of this existing neighborhood. Were we to reverse our determinations here, neighbors and visitors would be exposed to the industrial-type activities of a multi-faceted and significant quarry operation, and they would experience noises, sound levels, and heavy truck traffic not yet present in this rural, residential area. We compared these characteristics of the proposed quarry with the established residential and recreational uses for this scenically beautiful area. Even Rivers' own expert made the extraordinary recommendation that neighbors and

visitors should protect themselves during blasts that would regularly occur over the expected thirty-three-year life of the quarry.

Rivers chides the Court for its reasoning, but fails to provide a single example of where such a new and extremely different set of activities has been approved for a rural residential setting. We concluded that the changes the Rivers quarry would bring to the area would be unduly harmful to the surrounding neighborhood. We decline to reverse our determinations under criterion 9(E).

## IV.    Criterion 10: conformance with town plan

In its critique of the Court's legal analysis of the proposed project's conformance with the Town of Moretown Town Plan ("Town Plan"), Rivers offers several criticisms, including a lack of analysis of the Town Plan provision that recommends for responsible extraction of renewable and finite natural resources (found on page 34 of the Town Plan) and a lack of specificity in the Plan provisions with which the proposed project conflicts. First, we note that the Merits Decision includes specific factual findings that reference provisions of the Zoning Regulations and the Town Plan that acknowledge earth extraction activities as a conditional use. See Merits Decision at 68–69, ¶¶ 212 and 216. Further, our Merits Decision noted the multiple pretrial motions and decisions rendered in these appeals. Merits Decision at 2. To the extent that those pretrial rulings have not been disturbed by the Merits Decision, they have become part of the law of this case.

However, Rivers would have us increase the importance of our pretrial ruling that the Zoning Regulations and Town Plan acknowledge earth extraction activities as a conditional use to a new level: Rivers asserts that it is entitled to approval of its proposed quarry, albeit with appropriate conditions. We know of no such prior precedent and decline to create it here. While approval with conditions has been an accepted regulatory practice for many years, there are occasions where a proposed project's nonconformance is so significant that conditional approval is not the proper response. See Re: McLean Enters. Corp., No. 2S-1147-1-EB, Findings of Fact, Conclusions of Law, and Order at 62 (Vt. Envtl. Bd. Nov. 24, 2004) ("[T]he Board will deny a permit if permit conditions cannot be drafted to alleviate the undue adverse impact."). We concluded before that the nonconformities under criterion 8, 9(E), and 10 were so egregious as to make approval with conditions unworkable. Upon reflection, we conclude that our prior assessment was warranted by the facts presented and found credible.

Part of criterion 10 requires that a reviewing court determine whether the proposed project conforms to the applicable provisions of any duly adopted town plan. The factual findings in the Merits Decision are cumulative in nature. We therefore relied upon all 223 Findings in rendering our legal conclusions under criterion 10. Several of those Findings reference specific provisions of the Town Plan, and they recite the conflicts the Rivers quarry, as proposed, presents to the Town Plan. We decline to elaborate further on our legal conclusions here, since any elaboration would merely recite our legal analysis in the Merits Decision. To the extent that Rivers asserts that the Plan provisions suffer from the vagueness articulated by the Supreme Court in In re JAM Golf, LLC, 2009 VT 100, we respectfully disagree. A Town Plan, by its stated purpose, often speaks in general terms, while articulating the specific hopes and land use plans a community has for itself. Those specific plans and goals for the area surrounding the Rivers property are clearly articulated in the Town Plan. We do not believe a more detailed analysis than that found on our Merits Decision is needed.

### Conclusion

Pursuant to Rivers' request, we have again reviewed our Merits Decisions and the factual findings and legal conclusions that Rivers challenges in its motion to alter. However, for all the reasons stated in more detail above, we decline to alter those findings and conclusions and therefore **DENY** Rivers' motion. Our Merits Decision of March 25, 2010 remains as issued.

Done at Newfane, Vermont, this 17th day of August, 2010.

_____
Thomas S. Durkin, Environmental Judge